3 G   281
22 SC ¹ 44

# Wethrill's Appeal.

1. *Semble* that the assignee of a mortgage is protected from secret equities of all others than the mortgagor.

2. A mortgagee is a purchaser in form, although he has no estate in the land mortgaged, and the transaction is governed by different principles from those which apply to a chose in action.

3. Where a chose in action is capable of a legal assignment, and is assigned under the act of 28th May, 1715, the assignee must take it discharged of the equities of third persons, for in such case he stands on his legal rights, and does not need the interposition of a chancellor.

4. An assignee of a chose in action for value is not bound by a parol agreement not known to him, which has been made with a stranger to the contract he bought, and which was intended to destroy the legal effect of the record.

5. When one of two innocent persons must suffer, he must bear the burden or loss whose act or neglect has been the occasion of the suffering.

6. Laches in the holder of a secret equity will postpone him. Even an equity in an obligee will be lost by neglect to assert it, and *a fortiori* will a third person lose his right by any laches which causes an injury to a purchaser of a chose in action.

7. The holder of a secret equity against the obligee, collateral to the contract, may not by action or inaction unnecessarily expose others to loss in purchasing the contract.

APPEAL of Isaac Wethrill from the decree of the Court of Common Pleas of *Wayne County,* distributing the proceeds of the sale of the real estate of Almeron Field and another.

In 1845 and previously thereto, the title to the real estate sold was in Almeron Field and Charles D. Cox as tenants in common, subject to a balance of about $700 purchase money due to the Delaware and Hudson Canal Company. On the 5th of May, 1845, Cox and wife, for the consideration of $4,000, conveyed his half interest to said Field. Field gave Cox two judgments to secure the payment of the purchase money, which after several revivals and assignments became vested in Calvin. P. Milliken, the appellee. The judgments had been regularly revived and were a first lien, and were *bona fide* held and owned by Milliken, and *prima facie* entitled to the money.

The appellant claimed to have the money applied to the payment of a mortgage on the premises sold, given by David Abel to Almeron Field, subsequent to the date of the judgment, upon which there was due at the day of sale $5,894 14, which mortgage had been assigned to Charles E. Quincey July 29,

1847. Quincey, on the 15th December, 1853, at the city of New York, made a general assignment for the benefit of creditors, including the mortgage to Isaac Wethrill, the appellant, which was recorded in New York, but not in Pennsylvania. On the 8th of June, 1846, Almeron Field sold the real estate from the sale of which the money was made, to David Abel, for $9,500. As part of this consideration Abel agreed to pay the judgments of Cox *v.* Field, and he received a credit from Field on his purchase money for this assumption.

In further part payment of this purchase money, Abel agreed to pay $2,000 in cash, and gave the mortgage upon which appellant claims the money. In 1847 and 1848, while he was the owner of the property, he paid to the holders of these judgments the money due on them, and procured them to be assigned to his brother, John Abel, Jr., through whom the title to Milliken, the appellee, is derived. Appellant claims that as to David Abel or John Abel, Jr., these judgments were extinguished or discharged in favor of Field and his assignees of said mortgage, and that no assignees of the judgment claiming under them can be in any better situation. C. S. Minor, Esq., the auditor to whom the distribution had been referred, applied the money to the payment of the two Field judgments, then owned by Milliken, which appropriation the court approved, and confirmed the report, and this is the error assigned.

*Reeder* and *F. M. Crane,* for appellant.

In 1847 and 1848, when David Abel paid the judgment under which the appellee claims the fund, the mortgage had been assigned by Field to Charles E. Quincey. The conflict of rights thus first arose between John Abel, Jr., the nominal holder of the judgments for his brother David, and Quincey, the assignee and then owner of the mortgage. The judgments were the first liens, and immediately subsequent to them was the mortgage. The beneficial plaintiff in the former was the mortgagor and debtor in the latter and the owner of the lands on which the lands purported to rest. In addition to this he was under a positive contract obligation to satisfy and discharge those judgments of record for the benefit of the mortgage. Had the facts of sale and necessary distribution occurred to test the right at the time, there would have been no room to question the right of Charles E. Quincey to the money. This position, we suppose, will not be denied. The question then which this case now presents is whether the relative rights of these parties are changed by reason of the transmission of these securities through and into the hands of other parties.

Calvin P. Milliken, the last assignee of the judgments, may be treated under the evidence as a *bona fide* assignee for value.

As to the appellant, it may safely be taken for granted, that being the trustee or assignee for creditors, he has succeeded to the rights of Quincey in all their length and breadth.

As to the appellee, the fact that there were intermediate assignees of the judgments can make no difference, even if all of them were purchasers for value without notice. We treat him in this argument as such a purchaser, and give him all the consideration that flows from that fact; more than this any number of predecessors could not give him. Thus, the question to be examined is narrowed down and simplified to the inquiry, whether a judgment, fraudulent or extinguished, in the hands of the assignor, can become valid and available in the hands of an innocent assignee.

These judgments would be of no avail in the hands of David Abel as against Field, or those who succeeded to his rights, because, first, the application to them of Abel's money had extinguished them; and, second, it would be a fraud in him to use them to the prejudice of the Field mortgage, for the benefit of which he had agreed to remove them. *Lancaster* v. *Dolan*, 1 R. 231; *Philips* v. *Bank of Lewiston*, 6 Har. 403; *Smith* v. *Shuler*, 12 S. & R. 241; *Wheeler* v. *Hughes*, 1 Dall. 23; *Metzgar* v. *Metzgar*, 1 R. 227; *Snowden* v. *Tiffany*, 5 W. & S. 370; *Northampton Bank* v. *Balliet*, 8 W. & S. 318; *Rider* v. *Johnson*, 8 H. 193; *Craft* v. *Webster*, 4 R. 242; *Murray* v. *Lylburn*. 2 J. C. R. 443; *Livingston* v. *Dean*, id. 479; *Davies* v. *Austin*, 1 Ves. Jr. 249; *Tuston* v. *Benson*, 1 P. Wms. 496; *Norton* v. *Rose*, 2 W. C. C. R. 233; *Mott* v. *Clark*, 9 Barr, 400; *Fisher* v. *Knox*, 1 Har. 922; 2 White & Tudor's Eq. Ca. 215, 233, 234.

The firmly fixed and logical rules of equity are:—

1. That the assignee of a chose in action takes it subject to all the latent equities that exist against his assignor.

2. That an obligor holding such equity may enforce it unless he estops himself by speaking falsely when called on, or by being silent when opportunity and circumstance would compel an honest man to speak.

3. That a third person holding such equity is secured in his title by the rule of *prior in tempore potior in jure*.

4. That he may estop himself of his right in the same manner as the obligor.

5. That when a loss must fall on one of two innocent persons, he must bear it whose omission to attend to some requirement of law or notice, or whose neglect of some plain legal or equitable duty, for the protection of others, shall have occasioned the loss.

[Wethrill's Appeal.]

6. That where equities are precisely equal, a legal advantage will turn the scale.

*Samuel E. Dimmick,* for appellee.

Is the appellee to be defeated by the agreements of the parties, which they never entered of record, which for some twelve years were alone known unto themselves, and during which period they never sought to enforce—and by the alleged frauds, contrary to said agreements, practised by the very man from whose actions flows the equity invoked by the appellant? From such a proposition we entirely dissent. The appellant, who has never paid one dollar upon these judgments, cannot be permitted *in equity* to set them aside, that he and David Abel may profit thereby against the legal and equitable rights of the appellee, *bona fide* holder of the same. 4 Rawle, 401; *Hauer's Appeal,* 5 W. & S. 474; *Drexel's Appeal,* 6 Barr, 276; *Dickson's & Haven's Appeal,* 7 Barr, 256; *Watson* v. *Willard,* 9 Barr, 89; *Cyphert* v. *McCune,* 10 Harris, 196; *Woods* v. *Wallace,* 10 H. 177; *Claason's Appeal,* 10 H. 357; *Redfearn* v. *Ferrie,* 1 Dow. 50; *James* v. *Morey,* 2 Cowen, 240; *McConnell* v. *Wenrich,* 4 H. 365; *Post* v. *Carmalt,* 2 W. & S. 70; 1 Fonb. Eq.

The opinion of the court was delivered at Harrisburg, May 4, 1859, by

STRONG, J.—Whatever may have been the rights of Almeron Field or his assigns against the holder of the Cox judgments, after they had been purchased by John Abel with David Abel's money, it is clear that the judgments were not actually paid. They were regularly assigned to John Abel as living judgments, and the intention of the arrangement was to keep them alive. Admitting that Field might have enforced the entry of satisfaction upon them had he retained his contract with David Abel, it is not so sure he could have done so against Milliken, a subsequent *bona fide* holder, and purchaser without notice. But even if he could, can the holder of a subsequent mortgage? Not as mortgagee, because the equity did not arise from the mortgage, and did not pass to him by its assignment. It had its origin in the agreement of June 8th, 1846, by which the mortgagor engaged to assume the payment of the Cox judgments. That agreement was a mere personal contract of Field with David Abel, the purpose of which was not to give additional security to the mortgage which Field was taking, or to give it priority over the judgments. That was impossible without the consent of Cox. The agreement was designed rather to secure the payment of that part of the purchase money of

the "Mansion House" property which should not be included in the mortgage. On the 29th of June, 1847, all the rights of Field under this agreement were transferred to Quincey, the assignee of the mortgage, and they constituted the basis of whatever equity he has against Milliken, the present holder of the judgments. In the hands of the assignee the agreement became a contract collateral to the mortgage, and tending to enlarge its security. Since the assignment Field has had no rights under it, and has not been able to use it for any purpose against any person. Treating it, then, as a secret equity outstanding, not in the debtor but in a third person, the aspect most favorable to the appellant in which it can be regarded, can it prevail against the assignee of the judgments for value without notice of it? It is to be observed, that though at first it was an equity existing in the obligor in the judgment bonds, yet it was not an equity against the obligee, nor was it, while it remained in Field, against any assignee of the obligee. There never was a time when Field could have called upon the holder of the judgments to extinguish them. If, when John Abel took assignments of them, a chancellor would have ordered them to be satisfied, it must have been at the instance of Quincey, who was the owner of the agreement under which the equity against David Abel arose. Is, then, the assignee of a chose in action affected by secret equities existing against his assignor, not in the debtor but in third persons, of which he had no notice when he purchased. This is a question not free from difficulty and not fully settled by authority. It is not easy to see how an assignee can take an interest superior to that which the assignor had to give. An outstanding equity against the owner of a chose in action is an ownership of part of the title to it, or a deduction from its value; if this ownership, or a right to a deduction be in the debtor, all the cases agree that an assignment of the chose passes it to the transferee with all its defects upon it. Is not an equity in a third person as much a defect in title as if it existed in the obligor? Yet it has not been so treated. The assignee of a mortgage, it would seem, is protected from secret equities of all others than the mortgagor. A mortgagee is, however, in form a purchaser, although he has no estate in the land mortgaged. The contract is a mere security for money, yet it is recognized as having some of the incidents of a purchase, and is governed by different principles from those which apply to a chose in action. And when a chose is capable of a legal assignment, as under the act of assembly of 28th of May, 1715, a bond, specialty, or note, and when the chose is thus assigned, the assignee must take it discharged of the equities of third persons, for, in such a case, he stands on his legal right, and needs no

interposition of a chancellor. His title is complete without
equitable aid, and there is, therefore, no contest between two
equities. In regard to equitable assignments of other choses
in action, the same considerations do not exist. In such cases
an assignee must appeal to a chancellor to make his assign-
ment available, and when before him, why is not the equity of
the third person, if prior in time, superior in right? Yet the
tendency of modern authority seems to be, that the only equi-
ties that affect the assignee are those which exist in the obligor
or debtor. In *Redfearn* v. *Femier*, 1 Dow. 50, a case ruled in
the House of Lords, it was argued by Sir Samuel Romilly that
a bond assigned by the assignee is subject to the demands of
the obligor upon it, but not those of a third person; and Lord
Elden, in delivering the judgment, declared such was the law.
He had looked anxiously and carefully to see where latent
equities had prevailed against intimated assigns—(assignments
with notice to the debtor) and had found none. In *Murray* v.
*Lylburn*, 2 John Cha. 441, the same doctrine was strongly as-
serted by Chancellor Kent as a general proposition. His lan-
guage was, that "it is a general and well settled principle, that
the assignees of a chose in action take it subject to the same
equities it was subject to in the hands of the assignor. But
this rule is generally understood to mean the equity residing
in the original obligor or debtor, and not an equity residing in
some third person against the assignor. He takes it *subject to
all the equities of the obligor*, say the judges in the elaborately
argued case of *Morton* v. *Rose*, 2 Wash. 233 and 254, on this
very point touching the rights of the assignee of a bond. The
assignee can always go to the debtor and ascertain what claims
he may have against the bond, or other chose in action which
he is about purchasing from the obligee, but he may not be
able, with the utmost diligence, to ascertain the latent equities
of some third person against the obligee. He has not any ob-
ject to which he can direct his inquiries; and for this reason
the claim of an assignee, without notice, of a chose in action
was preferred in the case of *Redfearn* v. *Ferriee et al.*, 1 Dow.
50, to that of a third person setting up a secret equity against
the assignor." The same doctrine was asserted in *Livingstone*
v. *Dean*, 2 Johns. Cha. 479. Both of these cases, indeed, arose
upon assignments of mortgages, and both were ruled upon
other circumstances appearing in them; but the chancellor
asserted the principle as applicable to assignments of all choses
in action. The same rule was laid down in *Moore* v. *Holcomb*,
3 Leigh. 596, and it has been repeatedly recognized in Penn-
sylvania as extending to assignments in choses in action gene-
rally. In *Mott* v. *Clark*, 9 Barr, 399, the case of *Murray* v.
*Lylburn* is cited with approbation. This, also, was a case of an

assignment of a mortgage. But, in *Hendrickson's Appeal*, 12 Harris, 363, the doctrine was more distinctly announced, and was applied to the case of an assignment of a judgment. There it had been agreed between all the parties to a mortgage, and a judgment registered on the same day, that the lien of the mort-gage should have a priority over that of the judgment. An assignee of the latter, for value without notice of the agreement, was held not to be affected by it. His equity prevailed over the prior equity of the holder of the mortgage who set up the secret agreement. BLACK, J., in delivering the opinion of the court, said: "The judgment, however, had been assigned for a valuable consideration, without notice to the assignee of the parol promise to postpone it. Is the assignee bound to carry out the agreement by giving the mortgage preference? or may she stand upon her legal rights? It is very firmly established that the assignee of a chose in action takes it subject to all its equities which affected the right of the original holder to re-cover it from the debtor. In other words, the debtor can make any defence to a whole or a part of the claim after the assign-ment of it which he could have made before. But it does not necessarily follow from this that an assignee is bound by a parol agreement not known to him, which has been made with a stranger to the contract he bought, and which was intended to destroy the legal effect of the record. If I take an assign-ment in good faith, or a judgment which the record shows to be the earliest lien on an insolvent estate, can a junior creditor, who would otherwise get nothing, defeat me by producing a secret agreement like this between himself and my assignor? Without hesitation we answer this in the negative. * * * One who has bought and paid for a judgment which appears on its face to occupy a certain position among the liens, is not bound by his conscience to take a lower place upon the record, because of a promise to that effect, made by his assignor, un-less he had notice of it." The same principle is to be found in *Taylor* v. *Gill*, 10 Barr, 431, and in *McConnell* v. *Wenrich*, 4 Harris, 365.

This is sufficient to indicate, if it does not fully determine, that the rule is that the purchaser for value of a chose in action is not to be affected by latent equities of third persons. He is only bound to inquire of the debtor, and there is much reason for such a rule. Secret equities in third persons are clogs upon alienation, and cannot, therefore, be favorites in law. The holder of them virtually empowers the creditor to practise a fraud upon the innocent—a fraud against which no vigilance can guard. Where an equity exists in the debtor the assignee knows where to inquire, but not so for latent claims of stran-gers. It may be said indeed that such claimants cannot know

to whom the creditor may assign the security, and cannot, therefore, give notice of his right, but his position as a secret claimant is the cause of the loss, if any occur, and where one of two innocent persons must suffer, the rule is that he must bear the burden or loss whose act or neglect has been the occacasion of the suffering.

Without pursuing this subject further, it may be said that all the authorities agree that the presence of laches in the holder of a secret equity will postpone him.    Even an equity in the obligor may be lost by neglect to assert it, and *a fortiori* will a third person lose his right by any laches which causes an injury to a purchaser of a chose in action.    This is well illustrated in *Fisher* v. *Knox*, 1 Harr. 622.    There the moiety of a judgment had been assigned, but the assignee did not mark his interest upon the docket, and the whole judgment was afterwards assigned by the creditor without notice to the assignee of any equity in a prior assignee.    The court postponed the first assignee to the second, and this though no law requires an assignment of judgment to be docketed.    Gibson, C. J., remarked that any one who leaves it within the power of another to deceive may be said to collude with him beforehand. Certainly a chancellor would not execute an equitable assignment in his favor.    The principle is that the holder of such a secret equity against the obligee, an equity collateral to the contract, may not by any action or inaction unnecessarily expose others to loss in purchasing the contract.    Applying this principle to the facts in this case, how stands the appellant? His rights originated in the agreement of June 8, 1846, by which David Abel undertook to assume the payment of the Cox judgments.    That was an assumption of immediate liability.    Until July 29th, 1847, when the agreement was assigned to Quincey, Field could have compelled payment by Abel by suit on any day.    After the assignment Quincey might have done the same.    He had knowledge of the judgments, and of the fact that their lien was superior to that of his mortgage, for the record and agreement gave him notice, and he took a transfer of the agreement to enable him to enforce the extinction of the judgments.    They were assigned to John Abel in 1847, revived at his instance against the land bound by the mortgage, and purchased by Milliken in 1851.    For nearly five years the appellant, and those under whom he claims, holding a secret equity, suffering it to remain dormant, allowed the world to believe that the judgments were what they appeared to be, and enabled the judgment creditor to sell them to a purchaser, whose utmost vigilance could not have discovered what is now set up to strip him of the fruits of his purchase.    It cannot be permitted that the holder

[Chew v. Chew.]

of a secret contract may lie by for so many years, suffer a false appearance to be held out to the world which he could have prevented, and then assert his contract against an innocent purchaser for value, on the ground that he is prior in time. Had Quincey been vigilant in the assertion of his rights, the purchase by Milliken would never have been made.

The decree of the Court of Common Pleas is affirmed, with costs to be paid by the appellant.